**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

June 10, 2014

# In the Court of Appeals of Georgia

A14A0421. DEKALB MEDICAL CENTER v. WHITTLEY

BRANCH, Judge.

DeKalb Medical Center ("DMC") appeals from an order of the DeKalb County Superior Court reversing a decision by the Georgia Department of Labor ("DOL"), which had denied unemployment benefits to Sharie Whittley, a former employee of DMC. On appeal, DMC contends that the trial court erred in reversing the DOL's benefit determination because some evidence supported the factual findings on which that determination was based. DMC further argues that given those factual findings, Whittley is not entitled to unemployment benefits under Georgia law. We agree with DMC and therefore reverse the order of the trial court.

The record shows that Whittley was employed by DMC as a mammographer in the Breast Center from July 2008 through October 12, 2012. Beginning in April

2012, significant performance issues arose with respect to Whittley's job. Ellis Carter, Whittley's immediate supervisor, counseled Whittley at least six times between April 3, 2012 and September 27, 2012 about these job performance issues. On June 18, 2012, Carter met with Whittley regarding complaints he had received about her from DMC's MRI Department. At that time, the MRI Department was understaffed and its employees were mostly male. Thus, until that Department could hire more staff, DMC policy was that mammographers from the Breast Center would be called into the Department to help position patients who were undergoing a breast MRI. Carter explained to Whittley that he had received several complaints that when called to assist with an MRI, Whittley did not report to the MRI Department promptly and that once there she displayed a negative attitude. Whittley expressed to Carter her disagreement with DMC's staffing policy, indicating that she did not think it was fair that Breast Center employees were being required to cover two departments. Carter responded that this was a "team effort" and that until more staff could be hired in the MRI Department, assisting with breast MRIs was part of Whittley's job as a mammographer. According to Carter, Whittley appeared to "understand fully" that responding in a timely manner to any request for assistance from the MRI Department constituted one of her job duties.

2

Less than two weeks after this counseling session, Carter received yet another complaint from the MRI Department regarding Whittley. In this instance, Whittley had waited 45 minutes before reporting to the MRI Department after being called and despite receiving additional phone calls from the MRI Department repeating its request for her assistance. At the administrative hearing, Whittley explained that on this occasion her delayed response resulted from the fact that the Breast Center was "busy" and she felt that her most important obligation was to take care of Breast Center patients "as quickly as I possibly [could]." Carter disputed the claim that the Breast Center was too busy for Whittley to respond timely to the MRI Department, and stated that Whittley could have gone immediately to that Department without causing any work delay at the Breast Center. Carter met with Whittley on June 29, 2012 about this incident; following that meeting, and having discussed the incident with the supervisors in the MRI Department, Carter concluded that Whitley had deliberately delayed responding to the MRI Department.[1]

---

[1] Carter testified that at the June 29 meeting, Whittley again expressed her disagreement with the DMC policy of using mammographers to assist with MRIs, and told Carter Breast Center employees should be used by the MRI Department only as a "last resort." This testimony was corroborated by Whittley.

3

After this meeting, Carter conferred with the DMC Human Resources Department and the decision was made to demote Whittley from her position as lead mammographer to staff mammographer. On July 5, Carter informed Whittley of her demotion and explained that Whittley would be allowed to remain as the lead mammographer until DMC hired someone to fill that position. It was Whittley's understanding that she was being demoted because of her failure to respond as quickly as possible to the MRI Department as well as her alleged failure to communicate effectively with her co-workers. After being informed of her demotion, Whittley had what was described as an "increasingly poor attitude," ceased communicating directly with the Breast Center staff, and often refused even to acknowledge her co-workers.

On September 27, Carter had another meeting with Whittley in which he explained that she needed to communicate better with her co-workers. He also told Whittley that the new lead mammographer would be starting the following week and that he needed Whittley to help train the new lead on the operations of the Breast Center and to communicate any and all information to the new lead that was relevant to that position. Carter further informed Whittley that because of her responsibilities with respect to the new lead, she would continue to be paid the salary of a lead mammographer during the transition period. During this meeting, Carter made clear

to Whittley that if she did not improve her job performance she would lose her job. When she filed for unemployment benefits, Whittley acknowledged that she had received this warning.

Despite this counseling session, Whittley did not improve her communications with the other staff at the Breast Center. Notably, she continued the practice she had developed following her demotion of failing to handle effectively written work orders that she received on behalf of the Breast Center. According to Carter, Whittley would not even deliver written work orders directly to the employee who would be performing the work. Instead, she would place any such orders she received in the drawer of the assigned employee, and would not tell the employee that an order was waiting for them. As a result, there were times when Breast Center staff did not realize they had a patient waiting to be seen or that they had been assigned some other task.

Additionally, after the new lead mammographer started, Whittley failed on at least three occasions to provide the lead with relevant information. Specifically, Whittley failed to inform the lead of pending cases that required follow up by the lead mammographer; the new lead learned of these cases after several days on the job, when she discovered the patients' charts. On another occasion, when the new lead asked Whittley about two biopsy patients being seen in the Breast Center, Whittley

5

denied any knowledge of the cases; when the new lead proceeded to work on those cases, she learned that Whittley had already performed the necessary tasks. Finally, when a surgeon came to the Breast Center with concerns, Whittley handled the situation herself, rather than directing the surgeon to the new lead.

As a result of Whittley's refusal to communicate with her co-workers and the new lead mammographer, DMC terminated Whittley's employment on October 12, 2012. Following her termination, Whittley filed a claim for unemployment benefits. The DOL denied those benefits on November 1, 2012, finding that Whittley had been fired for failing to perform her job duties despite having the ability to do so. Whittley appealed this decision and requested an administrative hearing, which was held on December 5, 2012. The day after that hearing, the administrative hearing officer issued a written decision in which she found that Whittley was aware of her job duties and responsibilities; that Whittley had been counseled several times regarding her employer's expectations as to those duties; that her failure to meet those expectations resulted in her demotion from the position of lead mammographer; that following her demotion Whittley was instructed to improve her communications with staff; and that despite these instructions Whittley failed to communicate relevant information to the new lead mammographer on at least three occasions. Based on these findings, the

6

hearing officer concluded that Whittley was terminated for failing to meet her employer's expectations regarding her job performance. The officer therefore affirmed the DOL's initial determination that Whittley was disqualified from unemployment benefits pursuant to OCGA § 34-8-194 (2) (A).[2]

Whittley appealed the hearing officer's decision to the DOL Board of Review ("the Board"), arguing that "there was no willful or deliberate act on my part that violated [a] company rule or order. I continued to communicate with staff at all times." The Board affirmed the decision of the administrative hearing officer. Whittley then filed a petition in the DeKalb County Superior Court seeking review of the DOL's decision to deny her unemployment benefits. The trial court reversed that decision, finding that DMC had failed to meet its burden of showing that Whittley deliberately and consciously failed to follow instructions or perform her job duties. The trial court further found that much of the evidence on which the hearing officer based her factual findings constituted inadmissible hearsay. DMC then filed an application for a discretionary appeal, which this Court granted. This appeal followed.

---

[2] Under this statute, an individual is disqualified from receiving unemployment benefits following his discharge or suspension "from work with the most recent employer for failure to obey orders, rules, or instructions or for failure to discharge the duties for which the individual was employed as determined by the Commissioner according to the circumstances in the case." OCGA § 34-8-194 (2) (A).

7

Under Georgia law, when considering an appeal from a decision by a DOL board of review "the findings of the board of review as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the court shall be confined to questions of law." OCGA § 34-8-223 (b). Thus, both the trial court and this Court must affirm the Board's factual findings if there is any evidence to support those findings. *Case v. Butler*, 325 Ga. App. 123, 125 (1) (751 SE2d 883) (2013). And because both the superior court and this Court apply the same standard of review, when we review a superior court's order affirming or reversing a board decision, "our duty is not to review whether the record supports the superior court's decision but whether the record supports the final decision of the administrative agency." *Davane v. Thurmond*, 300 Ga. App. 474, 475 (685 SE2d 446) (2009) (citation and punctuation omitted).

As noted above, a person will be disqualified from receiving unemployment benefits "when he or she has been discharged for failure to obey orders, rules, or instructions or for failure to discharge the duties for which the individual was employed." *Robinson v. Butler*, 319 Ga. App. 633, 635 (737 SE2d 731) (2013) (punctuation and footnote omitted). See also OCGA § 34-8-194 (2) (A). Before an individual may be disqualified under this code section, however, the employer must

show, by a preponderance of the evidence, "that the discharge was caused by the deliberate, conscious fault of the claimant." Id. (punctuation and footnote omitted).

DMC's stated reason for terminating Whittley's employment was her failure to improve her communications with the Breast Center staff and to communicate relevant information to the lead mammographer. The trial court found that under the circumstances, Whittley's termination for this reason did not support denying her unemployment benefits. In reaching this conclusion, the trial court disagreed with at least three of the Board's factual findings. First, the trial court disputed the Board's conclusion that Whittley was aware of her job duties at the time she failed to perform them. Specifically, the court stated that Whittley "was only aware of her job duties and responsibilities insofar as they were given to her progressively throughout her tenure" and that those duties and responsibilities were "often changing and consist[ed] of conflicting directives." The court further found that although Whittley was counseled a number of times regarding her failure to perform to her employer's expectations, such counseling did not show that Whittley was aware of her duties prior to the time she was counseled about not having performed them. Finally, the trial court rejected the Board's finding that Whittley had failed to communicate with the new lead mammographer on at least three occasions.

The trial court's findings with respect to Whittley's knowledge of her job duties and her failure to perform those duties conflict with the findings of the Board and reflect that the lower court failed to apply the appropriate standard of review, i.e., the court failed to limit its review to the question of whether any evidence supported the Board's findings on this issue. The trial court's order demonstrates that it was overturning the Board's findings because the court interpreted the evidence differently than did the Board. Moreover, unlike the Board, the trial court chose to credit Whittley's testimony over that of Carter. In weighing the evidence and judging the credibility of the witnesses, however, the trial court erred. We have repeatedly explained that in reviewing a DOL decision concerning unemployment benefits, "it is improper for the trial court to weigh and evaluate the evidence," *MCG Health v. Whitfield*, 302 Ga. App. 408, 410 (690 SE2d 659) (2010) (citation omitted), and that the superior court may not engage in independent fact finding. *Case*, 325 Ga. App. at 125 (1). Moreover, neither the superior court nor this Court may make credibility determinations, "[n]or may either court 'substitute its judgment on disputed issues of fact for that of the [Board]." *Solinet v. Johnson*, 280 Ga. App. 227, 229 (633 SE2d 626) (2006) (punctuation and footnote omitted). And when the correct standard of

10

review is applied, it is clear that the trial court erred in overturning the decision of the DOL, as that decision was supported by some evidence.

Despite the superior court's finding to the contrary, the record shows that Whittley was counseled on at least three occasions that she needed to improve her communication with Breast Center staff. Moreover, at her September 27 meeting with Carter, Whittley was specifically advised that when the new lead started the following week, Whittley would need to provide the new lead with all relevant information necessary for the new lead to perform her job effectively. Carter also explained to Whittley that in recognition of these additional job duties, DMC would provide Whittley with additional compensation. Carter's unrebutted testimony on this issue supports the Board's conclusion that Whittley was aware both that she needed to improve her communications with staff and that she had been tasked specifically with providing all relevant and necessary information to the new lead.

In rejecting the Board's finding that Whittley had failed to communicate relevant information to the new lead on at least three occasions, the trial court summarily concluded that Carter's testimony on this issue constituted inadmissible hearsay. See *Robinson*, 319 Ga. App. at 635-636 (1) ("inadmissible hearsay is not competent to prove a violation of an employer's policies or rules sufficient to

11

disqualify the employee for benefits") (punctuation and footnote omitted). The record, however, shows that not all of Carter's testimony on this issue was hearsay.[3] See *Miller Brewing Co. v. Carlson*, 162 Ga. App. 94, 95 (290 SE2d 200) (1982) ("[w]hile the record reveals that the supervisor who terminated petitioner's employment based his conclusions and actions partly on hearsay, we are not prepared to say this would serve to render his testimony worthless[,]" given that the supervisor also provided testimony "based on his personal knowledge and what the petitioner told him.") Carter, who was Whittley's direct supervisor, testified as to his personal observations, conversations he had with Whittley directly, and information he had been provided in his capacity as Whittley's supervisor (i.e., information he had received as part of his job duties).

Even assuming that some of Carter's testimony did constitute hearsay, his testimony concerning Whittley's failure to communicate with the new lead was corroborated by Whittley. With respect to whether she provided the new lead with all the relevant information about the two biopsy patients, Whittley testified that she had informed the new lead where "certain things were and where I kept everything," and

---

[3] We note that the trial court did not identify those parts of Carter's testimony it considered hearsay, nor did it analyze whether any such alleged hearsay would have otherwise been admissible under one or more exceptions to the hearsay rule.

12

that the new lead "knew exactly where all documentation was. I had all my notes, who I spoke to, what needed to be done, everything [that] was done." This testimony shows that Whittley may have provided the new lead with information as to where the new lead could find the biopsy patients' files; it does not show that Whittley communicated with the new lead directly about these cases. Whittley also testified that she "expected" the new lead to "come to [Whittley] and ask [her] . . . more in depth questions," thereby indicating that instead of providing the new lead with all necessary information, Whittley was relying on the new lead to come to her seeking that information.

Additionally, when asked about the assertion that she had failed to communicate with the new lead regarding patients requiring follow-up, Whittley stated that patient charts "not being followed up . . . that has been an ongoing issue that we've had and one thing . . . that I did was make sure . . . that I went through that case load at least three times a week." Notably, Whittley did not testify that she had informed the new lead about the need to go through those files. Nor did she otherwise dispute Carter's testimony that she did not provide the new lead with such information. Finally, Whittley admitted that when a surgeon came to her with an issue regarding the Breast Center, she addressed the problem with the surgeon rather than

13

referring the surgeon to the new lead. Thus, Whittley's own testimony constitutes some evidence to support the Board's finding that Whittley failed to communicate relevant information to the new lead, despite having been informed that providing such information was one of her job duties.

The evidence also supports the Board's conclusion that Whittley acted deliberately and consciously in failing to fulfill her job duties and was therefore disqualified from receiving unemployment benefits. Because intent is rarely susceptible of direct proof, a fact finder may infer such intent from all of the circumstances surrounding the conduct at issue. See, e.g., *Danforth v. Apple Inc.*, 294 Ga. 890, 892-893 (1) (a) (___ SE2d ___) (2014); *Nebo Ventures, LLC v. NovaPro Risk Solutions*, 324 Ga. App. 836, 840 (1) (c) (752 SE2d 18) (2013). Here, the finding that Whittley failed to fulfill her job duties despite her knowledge of those duties and despite the fact that she was receiving additional compensation to perform some of those duties supports an inference that Whittley's conduct was both knowing and deliberate. *Solinet*, 280 Ga. App. at 229 (evidence showing that employee charged with distributing parking passes failed to comply with employer's policy regarding issuance of such passes after having had been instructed previously to comply with

that policy supported a finding that the employee had deliberately and consciously failed to fulfill her job duties).

Accordingly, "[b]ecause there was some evidence to support the DOL's decision to deny benefits, the superior court erred in reversing the DOL's decision." Id. (footnote omitted). We therefore reverse the order of the trial court.

*Judgment reversed. Barnes, P. J., and Boggs, J., concur.*